**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ALICE RUIZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:11-CV-1706-BH |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pursuant to the consent of the parties and the *Order Reassigning Case*, dated July 27, 2011, this case has been transferred for all further proceedings and entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed September 30, 2011 (doc. 19), and *Defendant's Motion for Summary Judgment*, filed October 31, 2011. (doc. 20.)  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED**, Defendant's motion is **DENIED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**I.  BACKGROUND[1]**

**A.**    **<u>Procedural History</u>**

Alice Ruiz (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability benefits under Titles II and XVI of the Social Security Act.  (R. at 27.)  On April 25, 2007, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability beginning on May 1, 2005, due to neck and

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

left arm pain, arthritis, sleep apnea, depression, and bipolar disorder.  (R. at 143.)  Her applications were denied initially and upon reconsideration.  (R. at 18.)  She timely requested a hearing before an Administrative Law Judge (ALJ).  (R. at 81-82.)  She personally appeared and testified at a hearing held on January 7, 2009. (R. at 37-67.)  On December 22, 2009, the ALJ issued his decision finding Plaintiff was not disabled.  (R. at 18-27.)  She requested review of the ALJ's decision, and the Appeals Council denied her request on March 17, 2011, making the ALJ's decision the final decision of the Commissioner.  (R. at 4-7.)  She timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

**B.**    **Factual History**

      **1.**    **Age, Education, and Work Experience**

Plaintiff was born on June 21, 1969.  (R. at 40, 109.)  At the time of the hearing before the ALJ, she was 38 years old.  (R. at 40.)   She has a General Equivalency Degree (GED) and past relevant work as a custodian, a car detailer, a cashier, and a telemarketing customer service representative.  (R. at 40, 61.)

      **2.**    **Medical, Psychological, and Psychiatric Evidence**

In 2003, Plaintiff was injured in an automobile accident that she contends has caused her neck and back pain ever since.  (R. at 256, 280.)  On June 2, 2005, she presented to Parkland Hospital because she was experiencing menorrhagia with blood clotting.  (R. at 501, 507.)

Plaintiff began receiving mental treatment from ABC Behavioral Health Clinic in April 30, 2004, which continued through November 21, 2008.  (R. at 332-415.)  During a counseling session on May 3, 2005, she complained of having insomnia and feelings of sadness.  (R. at 401.)  She reported no hallucinations or suicidal or homicidal ideations.  (*Id.*) The treating clinician found that

- 2 -

she was cooperative and "responsive to cues from [the] interviewer;" her appearance was "disheveled;" her psychomotor activity appeared "retarded;" and her thought process was logical. (*Id.*) It was noted that Plaintiff had a dependency to cocaine. (*Id.*) The clinician prescribed her four medications and scheduled a follow-up consultation. (R. at 400.)

On June 14, 2005, Plaintiff reported being "overwhelmed" with depression and stated that she had been off her medications for two weeks. (R. at 399.) She reported that her medications improved her sleep. (*Id.*) On September 30, 2005, she reported to be depressed. (R. at 393.) A mental status report from October 7, 2005 noted that she was well-groomed; her speech was "normal;" she was "cooperative;" her psychomotor activity was "normal;" her thought process was "logical;" and she reported no delusions, hallucinations, or suicidal or homicidal ideations. (R. at 391.) On November 21, 2005, she stated that her mood was "better," her affect was found to be "euthymic," and a mental status report was unremarkable. (R. at 387.)

On January 17, 2006, Plaintiff underwent a toxicology test and tested positive for cocaine. (R. at 221.) On February 10, 2006, she underwent a partial hysterectomy to correct her menorrhagia with blood clotting. (R. at 269, 472, 491.) On June 29, 2006, another test was taken and was negative in all aspects. (R. at 161-62.)

On numerous visits to ABC Behavioral, Plaintiff reported feeling, depressed, irritable, and having difficulty concentrating. (*See* R. at 334, 346, 348, 356, 363, 365, 373, 375, 385, 605.) On other visits, however, she reported to clinicians that she was feeling "just fine," "very well," "better," and "stable", and that her medicines were helping. (R. at 333-35, 352, 354, 365, 381, 379.) On July 7, 2006, she told a clinician that she had racing thoughts and got "mad very quickly." (R. at 377.) The clinician noted that she had no drug dependencies. (*Id.*) On August 15, 2006, she reported feeling "very sad," apathetic, and lethargic, and stated that she was experiencing panic

- 3 -

attacks.  (R. at 369.)

On November 22, 2006, Plaintiff returned to Parkland Hospital complaining of pain in her neck and back.  (R. at 282.)  She told the examining physician that her pain was initially relieved with chiropractic treatment, but that it had returned in 2004 and intensified in October 2006.  (*Id.*)  X-rays were taken of her cervical spine and she was diagnosed with "advanced degenerative disc disease at C4-C5 through C6-C7."  (R. at 290.)

On November 30, 2006, an MRI was taken of Plaintiff's cervical spine.  (R. at 263.)  On December 20, 2006, an elevated liver function test revealed that Plaintiff had "hepatomegaly with fatty infiltration of her liver."  (R. at 284-88.)

On January 28, 2007, Michael J. Bolesta, M.D., an orthopedic surgeon, opined that the MRI impressions revealed severe degenerative changes at C1-C2, broad-based disc osteophyte complex and bilateral mild uncal vertebral joint hypertrophy at C4-C5, a disc bulge at C5-C6 with mild to moderate canal stenosis, and a minimal bilateral broad-based disc bulge at C6-C7.  (*Id.*)

On March 9, 2007, Plaintiff returned to ABC Behavioral and reported feeling irritable and depressed.  (R. at 362.)  The treating clinician prescribed her Celexa for her symptoms.  (*Id.*)  On April 6, 2007, she reported that her new medication increased her depression and anxiety and caused her to have "racing thoughts."  (R. at 361.)  On May 4, 2007, she underwent a subsequent psychological evaluation.  (R. at 358.)  She reported being depressed and irritable but had no suicidal or homicidal ideations.  (R. at 359.)  The clinician noted that her concentration, insight, judgment, and short and long-term memory were intact; her intelligence was estimated to be "average;" her affect was congruent; and her thought process was well-organized.  (*Id.*)  A mental status report was unremarkable, except for her depression and irritability.  (R. at 355.)

On July 19, 2007, Deborah Whitehead Gleaves, Ph.D., a state agency psychological

consultant, performed a psychological evaluation.  (R. at 291-96.)  Plaintiff reported that she had

"had problems with mood and depression all of her life," and that at age 16 she attempted to commit

suicide and was hospitalized in a psychiatric unit.  (R. at 291.)  She developed a drug and alcohol

problem at age 16 due to her family instability and personal difficulties. (R. at 292.)   She

subsequently received treatment for her alcohol and drug abuse at ABC Behavioral Health Clinic.

(*Id.*) She stated that she "ha[d] not had any significant alcohol intake or drug use in the past three

or four years."  (*Id.*) She still felt depressed about five days a week, but her medications eased her

depression.  (R. at 291-92.)  She was arrested in 2001 for aggravated assault with a deadly weapon,

spent six months in jail, and was placed on a 10-year probation.  (R. at 293.)

    During her consultation, Dr. Gleaves opined that Plaintiff's grooming was adequate; her

posture and gait were within normal limits; her speech was clear and coherent; she made good eye

contact; she was cooperative and easily engaged; her thoughts were coherent, relevant, and logical;

her mood was depressed but with appropriate affect; and she was fully oriented. (R. at 291, 294.)

She estimated Plaintiff's intelligence to be "low average to borderline."  (R. at 294.)  She diagnosed

her with bipolar disorder, depressed mood, disturbed sleep and appetite, moodiness, irritability,

mood swings, impulsivity, and history of drug abuse.  (R. at 295.)  She assigned her a Global

Assessment of Functioning (GAF) score of 60.  (*Id.*) She noted that Plaintiff had overcome her

substance abuse and had reported some improvement with her depression.  (*Id.*)

    On July 30, 2007, Robert B. White, Ph. D., a state agency psychiatric consultant, reviewed

Plaintiff's medical and psychological records from March 29, 2007 to July 30, 2007, and completed

a Psychiatric Review Technique and a Mental RFC Assessment.  (R. at 297-314.)  He determined

that Plaintiff had a mild restriction in her activities of daily living and moderate difficulties in

maintaining social functioning, concentration, persistence, or pace. (R. at 307.)  He found that she

was able to drive, shop by herself, cook for her family, work in her yard, attend church, and had worked as a telemarketer until recently.  (R. at 309.)  He concluded that the medical evidence in the record did "not reflect a degree of mental or emotional signs or symptoms that work-related abilities or activities would be significantly or consistently compromised."  (*Id.*)

On August 1, 2007, Yvonne Post, D.O., a state agency medical consultant, reviewed Plaintiff's medical records and issued a Physical Residual Functional Capacity (RFC) Assessment. (R. at 315-22.)  She determined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand, walk, and sit for 6 hours in an 8-hour workday; could push and pull an unlimited amount of weight; and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 317.)  She did not find Plaintiff to have any manipulative, visual, communicative, or environmental limitations.  (R. at 318-19.)  She noted that Plaintiff had been found to "have some rather severe degenerative changes in her cervical spine," but  opined that she had "no appreciable neuro deficits" and "no signs of severe dysfunction of either cervical or lumbosacral nerve distribution."  (R. at 322.)  She explained that her RFC assessment "[took] into account [Plaintiff's] allegations of intermittent pain in her neck and low back" and concluded that her alleged limitations were not fully supported by the medical evidence on record.  (*Id.*)

On September 7, 2007, Plaintiff reported feeling "unstable" and "more down."  (R. at 350.) On November 30, 2007, she reported being depressed because her 16-year old daughter had run way from home. (R. at 341.)  However, she also stated that she was "able to deal better with [that situation] due to her med[ications]," and that her Celexa was "better than before" in easing her depression.  (R. at 342.)

On December 3, 2007, Plaintiff presented to the emergency room complaining of numbness in her hands and pain in her back and neck that radiated to her hands.  (R. at 433.)   On February

13, 2008, she returned to Parkland Hospital complaining of fevers, chills, numbness in her hands, and difficulty maintaining her balance. (R. at 516.) Physicians diagnosed her with spinal stenosis, chronic pain syndrome, lower back pain, and cervical spondylosis[2] with C1-C2 involvement. (R. at 434.) They also informed her about the "dangers" and "warning signs" associated with her spinal stenosis, which included "balance issues, numbness, and weakness." (*Id.*)

On February 19, 2008, Plaintiff returned to Parkland Hospital for numbness in her neck and in both of her hands. (R. at 420.) She had those symptoms for about three years, but they had worsened in the past year. (*Id.*) Her pain and numbness woke her up at night and were exacerbated by holding a phone, cleaning house, and cooking. (*Id.*) She was noted to be pleasant and cooperative, and her extremities showed no swelling, tenderness, or muscle atrophy. (R. at 421.) An electro-diagnostic exam (EMG) was found to be "abnormal" and showed "evidence of mild sensory median nerve neuropathy at [Plaintiff's] left wrist, consistent with carpal tunnel syndrome." (R. at 424.) Jian Hu, M.D., the examining physician, opined that the EMG revealed "no ... evidence of radiculopathy or plexopathy in [Plaintiff's] bilateral upper extremities," but opined that the numbness and pain in her left shoulder and arm were "consistent with left C7 radiculitis."[3] (*Id.*) He recommended she undergo further evaluations. (*Id.*)

On May 12, 2008, Dr. Bolesta opined that Plaintiff had a "full range of motion [in her] cervical spine", and that while the sensation in her right upper extremities was "grossly intact," she

---

[2] Cervical spondylosis is a "degenerative disease of the vertebrae of the neck affecting the joints ... and discs between the vertebrae and the surrounding ligaments and connective tissue" and its signs and symptoms include: "[g]radually increasing neck pain; impaired range of motion; stiffness in the neck; headache; loss of balance; [and] loss of sensation in the shoulders or arms." *Attorneys' Dictionary of Medicine and Word Finder* C-176 (LexisNexis, 2011).

[3] Radiculitis is "nerve inflamation involving the roots or a root of a spinal nerve." *Attorneys' Dictionary of Medicine and Word Finder*, at R-9.

"did show changes along her left C5, C6-C7 dermatome."  (R. at 650.)  Based on the February 2007 MRI, he opined that the pain in Plaintiff's neck and arm was "related to degenerative disk disease of cervical spine with disk space narrowing and protrusions at C4-5, C5-6, and stenosis" and advised her to undergo a new MRI, as she was "showing progressing changes in her neck and upper extremity pain."  (*Id.*)

On May 18, 2008, a new MRI was taken of Plaintiff's cervical spine.  (R. at 647.)  Chien I. Yang, M.D., opined that the new test revealed a "stable loss of cervical lordosis," but that the "alignment, vertebral body morphology and height, marrow signal, cervicomedullary junction, cervical cord morphology and signal, and paravertebral soft tissues appear[ed] normal."  (R. at 647.) He found "mild central spinal stenosis at C4-C5 ... with bilateral neural foraminal stenosis," "broad-based disc bulge"at C5-C6, and "broad-based disc bulge" at C6-C7.  (*Id.*)  He diagnosed Plaintiff with "interval development of a far left lateral disc bulge narrowing C6-C7 neuroforamina" and "stable degenerative changes of the cervical spine."  (*Id.*)  On May 27, 2008, based on the new MRI, Dr. Bolesta diagnosed her with "left paracentral disk protrusion with left neural foraminal stenosis at C4-5, C5-6, and C6-7" and referred her to pain management. (R. at 645-46.)

On July 18, 2008, Plaintiff told clinicians at ABC Behavioral that she was experiencing housing instability and currently living with her boyfriend.  (R. at 608.)  She said that she "really want[ed] a job" and was applying for at least two per week.  (R. at 609.)  Clinicians opined that she was "doing very well" and did "not show any reason for more intensive case management."  (*Id.*)

On August 7, 2008, Laura L. Deon, M.D., diagnosed Plaintiff with "cervical, herniated nucleus pulposus with radiculopathy[4] on the left" and administered an epidural steroid injection for

_____

[4] Radiculopathy is a "[d]isorder of the spinal nerve roots."  *Stedman's Medical Dictionary* 1622 (28th ed. Lippincott Williams & Wilkins, 2006).

- 8 -

her pain.  (R. at 636.)  On August 22, 2008, Plaintiff presented for post-operative physical therapy and complained of pain in her neck that had been increasing for the past 10 years.  (R. at 623.)  On October 22, 2008, she reported pain in her neck and hands, which she rated at 7 in a 10-point scale.  (R. at 621.)  Constance Parry, a physical therapist, noted that she "demonstrate[d] poor posture habits and poor body mechanics" and diagnosed her with "postural dysfunction and cervical disc derangement."  (*Id.*)  Plaintiff stated that she "enjoy[ed] gardening and spen[t] hours doing it to help take her mind off things", and that she and her daughter liked to "pop their neck 'like the chiropractor.'"  (R. at 622.)  Ms. Parry instructed Plaintiff in using correct posture and body mechanics, modifying her activities of daily living, ergonomics, and the use of home modalities.  (*Id.*)  She also advised her to "stop manipulating her neck 'like the chiropractor.'"  (*Id.*)

On September 12, 2008, Plaintiff told clinicians at ABC Behavioral that she believed her medications were "not working as well as before."  (R. at 607.)  On November 14, 2008, she reported being compliant with her medications and stated that her depression and mood were "better."  (R. at 602-03.)  A mental status exam was unremarkable, and clinicians rated the severity of her bipolar symptoms at 1 in a 7-point scale.  (R. at 602.)

On March 9, 2009, Plaintiff presented at a hand clinic reporting pain in her left hand that had been going on for about two years.  (R. at 732.)  Kimberly K. Mezera, M.D. noted that the sensation in her radial and median nerve distribution of her left hand was "grossly decreased" and that most of her symptoms appeared to come from her neck.  (*Id.*)  Dr. Mezera diagnosed her with left hand pain and cervical radiculopathy and referred her to an orthopedic spine clinic.  (R. at 732-33.)

On April 15, 2009, Elizabeth Adams, QMHP, from ABC Behavioral, completed a Mental Assessment.  (R. at 661-63.)  Plaintiff reported having sadness, mood-swings, and an inability to

- 9 -

focus on a regular basis.  (R. at 662.)  Ms. Adams found that Plaintiff had a "substantial loss of ability" in 8 areas, including maintaining concentration for 2 hours or longer, accepting instructions and responding appropriately to criticism from supervisors, and coping with normal work stresses. (R. at 661-62.)  She found that Plaintiff had "some loss of ability" in 11 work-related areas, including the ability to understand and carry out complex and detailed, detailed, and simple instructions.  (R. at 661.)  She explained that the fact that Plaintiff could function minimally on that day did not mean it was the same "every day."  (R. at 662.)

On March 3, 2010, Plaintiff returned to Parkland Hospital complaining of neck pain and requesting refills for her pain medication.  (R. at 693.)  It was opined that she exhibited tenderness in her cervical back, but had a normal range of motion and no swelling, edema, deformity, pain, or spasms.  (R. at 694.)  She was diagnosed with chronic neck pain from cervical radiculopathy and was prescribed Flexaril.  (R. at 693.)

### 3.    Hearing Testimony

On January 7, 2009, Plaintiff, Plaintiff's sister, and a vocational expert testified at a hearing before the ALJ.  (R. at 37-67.)  Plaintiff was represented by an attorney.  (R. at 37.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 38 years old, single, and had two minor children, ages fourteen and seventeen.  (R. at 40.)  She completed the sixth grade and earned a GED.  (R. at 40.)  She was right-handed.  (*Id.*)  She last worked selling health insurance in 2007, and before that, she worked for a telemarketing firm as a customer service representative.  (R. at 41.)  She was laid off from her health insurance sales job because the pain in her neck made it difficult to speak on the phone and write.  (R. at 42.)

Plaintiff believed that she was unable to work because her left arm went numb and "start[ed] hurting really bad." (R. at 43.) Her doctors told her that it was due to "[d]eterioration of the bone." (*Id.*) In addition to the pain that radiated from her neck to her left arm, she had headaches every day. (*Id.*) Her doctor did not recommend surgery to correct her condition because she had a pinched nerve "close to [her] spinal cord", and there was a risk that the during the surgery the doctor "could hit another nerve" or "hit [her] spinal cord." (*Id.*)

Plaintiff's pain was "there all the time." (R. at 44.) The doctors prescribed her muscle relaxers and pain medication, but these were not entirely effective and were "basically ... like a band aid" for her pain. (*Id.*) Her pain medication caused her drowsiness. (*Id.*) Upon questioning by the ALJ, Plaintiff clarified that her primary physical problem was the pain in her neck and left arm that caused her to "drop a lot of things with [her] right hand" such as "cups, forks, knife[s]," and "whatever [she was] trying to use." (R. at 44-45.) She also testified that she drove every once in a while. (R. at 45.)

Plaintiff had difficulty focusing because "other things [came] into her mind" when she thought of things to do, and she could not be around a lot of people at a time because she became frustrated or confused. (*Id.*) She had experienced those problems for her for many years. (R. at 46.) She was diagnosed with bipolar disorder about four and a half years before and was prescribed medication to treat it. (*Id.*) The doctors switched her medications over the years until they "figured ... out" what worked best for her. (*Id.*) Her medication helped "somewhat" in controlling her bipolar symptoms. (R. at 47.) Her bipolar disorder caused made it difficult to focus and prevented her from working because she was unable to complete assignments. (*Id.*) Due to her condition, she had lost interest in a lot of things, gained a lot of weight, and had difficulty sleeping. (R. at 48.) She

took Trazodone for her insomnia.  (*Id.*)  She also experienced memory loss and had difficulty remember things that happened in the past.  (R. at 49.)

Plaintiff's oldest daughter and sister lived across the street from her and came to visit her because she did not go to their house.  (*Id.*)  She also had friends from church.  (*Id.*)  On a normal day, Plaintiff would get up and sweep the house or try to wash the dishes.  (*Id.*)  Her youngest daughter, who lived with her, cooked the family meals because it was difficult for her to stir with her right hand.  (R. at 50.)

In response to questions by the ALJ, Plaintiff testified that she believed she would have difficulty focusing on a job, she was not sure whether she could understand and remember simple instructions, and she believed she would have problems "behaving in an emotionally stable manner" because in her prior job she was "arguing ... and fussing with [her] customers."  (*Id.*)  She did not think she could be reliable on a job and work 40 hours a week because it was hard for her to focus and she probably "wouldn't go to work."  (R. at 51.)

 In response to counsel's questions, Plaintiff testified that she had panic attacks "all the time."  (R. at 51-52.)  During her attacks she had difficulty breathing, her chest felt hard, and she became confused.  (R. at 52.)  She also experienced mood swings "all the time" and tried to stay away from people because she knew that "anything [could] happen."  (*Id.*)  When she was angry, she would hit her "male friend" a lot and say "ugly things" to her daughters.  (*Id.*)  The day before the hearing, she told her daughter to "get out of the house" but later realized she was wrong.  (*Id.*)

Plaintiff received steroid injections to alleviate the pain in her left arm and an epidural injection in her neck.  (R. at 52-53.)  She had a problem with anemia in her blood that she believed had been corrected, and she had a partial hysterectomy to address other problems.  (R. at 53.)

The ALJ described to Plaintiff Dr. Post's physical RFC[5] and asked her whether she agreed or disagreed with those findings.  (R. at 53-54.)  She disagreed and explained that it was hard for her to lift and carry even 10 pounds because her right arm went numb every once in a while.  (R. at 54.)  She believed she could carry a gallon of milk, which the ALJ explained weighed about eight and a half pounds, but she did not know for how long she could do so.  (*Id.*)

Plaintiff did not believe she could stand and walk for six hours in an eight-hour workday.  (R. at 54.)  She did not believe she could stand for even two hours because her medication caused her to be tired "all the time", and she forgot a lot of things.  (*Id.*)  She could not sit for six hours in an eight-hour workday.  (R. at 55.)

Plaintiff spent six months in jail and was placed on probation for 10 years because she hit her sister-in-law with her car while she was on drugs.  (R. at 55-56.)  She could not remember when that occurred.  (R. at 56.)  She testified that she last used drugs in 2001 or 2002.  (R. at 56.)  She was sober and had not relapsed since then.  (*Id.*)  She was referred to ABC Behavioral and she felt like it had helped her "a lot, in a lot of things, [and] ... in a lot of ways."  (*Id.*)

Plaintiff began looking for work after she stopped receiving unemployment benefits and applied for two jobs a week.  (R. at 57.)  She looked for work because the steroid injections eased her pain.  (*Id.*)  She received unemployment benefits for three to six months.  (R. at 58.)

### b.  *The Sister's Testimony*

Plaintiff's counsel examined Ms. Catalina Rosado, Plaintiff's sister.  (R. at 58-60.)  Ms. Rosado testified that she lived across the street from Plaintiff.  (R. at 59.)  She testified that Plaintiff

---

[5]  According to the ALJ, Dr. Post found that Plaintiff could: lift and carry 50 pounds occasionally and  25 pounds frequently; be up 2 hours during an 8-hour workday; and stand, walk, and sit with normal job breaks for about 6 hours in an 8-hour workday.  (R. at 53-54.)

was "really, really, really forgetful" and that during dinner, for example, she would forget things that were said 10 minutes before.  (R. at 59.)  She stated that Plaintiff "[got]cranky real easy."  (*Id.*)  At the store, she would "get cranky just because someone walked by and looked at her."  (*Id.*)  Plaintiff could not be around a lot of people, and she became stressed "if a lot of company trie[d] to [go] over to see her."  (R. at 60.)  They could not "all be in the same room at the same time with her" because she became frustrated.  (*Id.*)

### c. *Vocational Expert testimony*

Selisa Beasley, a vocational expert (VE), also testified at the hearing. (R. at 37, 60-66.)  She testified that Plaintiff's past work history included jobs as a custodian (medium, SVP-2), a car detailer (medium, SVP-2), a cashier (light, SVP-3), and a telemarketing customer service representative (sedentary, SVP-3).  (R. at 61.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and job background could perform her past relevant work with the following limitations: could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, walk, and sit with normal breaks for six hours in an eight-hour workday; no pushing, pulling, or operational limitations of hand or foot controls; occasionally climb ramps and stairs, balance, stoop, knell, and crouch; limited to simple, routine tasks consisting of unskilled work; and no mor than occasional contact with the general public.  (*Id.*)  The VE testified that the hypothetical person could perform Plaintiff's past work as custodian. (R. at 62.)  If the lifting and carrying limitations were changed to occasionally lifting and carrying 20 pounds and frequently lifting and carrying 10 pounds, the hypothetical person could not perform any of Plaintiff's past relevant work.  (*Id.*)  She testified that the hypothetical person could perform other work including a garment steamer (light, SVP-2), with 2,770 jobs in Texas and 84,372 jobs in the

national economy; a collator operator (light, SVP-2), with 1,140 jobs in Texas and 33,598 jobs in the national economy; and a sheet metal duct maker (light, SVP-2), with 2,845 jobs in Texas and 28,450 jobs in the national economy.  (R. at 62-62.)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on December 22, 2009.  (R. at 27.)  At step one, he found that Plaintiff met the insured status requirements through June 30, 2011.  (R. at 20.) He also found that Plaintiff received unemployment benefits and engaged in substantial gainful activity during her alleged disability period and subsequently "sought to amend her alleged onset date to April 25, 2007."  (*Id.*)  Despite these findings, he proceeded to step two and found that Plaintiff had the following severe impairments: "degenerative disc disease cervical spine, low back pain, and bipolar not otherwise specified."  (R. at 21.)  At step three, he found that Plaintiff had no impairment or combination of impairments that satisfied the criteria of any impairment listed in the social security regulations.  (*Id.*)

Next, the ALJ determined that Plaintiff had the RFC to perform light work with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for about 6 hours of an 8-hour workday; occasionally climb ladders and stairs, balance, stoop, kneel, and crouch; and "simple routine tasks with no more than occasional contact with the general public." (R. at 22.)

At step four, based on the VE's testimony, the ALJ found that Plaintiff could not perform her past relevant work.  (R. at 25.)  At step five, he determined that considering Plaintiff's age, education, work experience, and RFC, she had the ability to perform other work existing in significant numbers in the national economy.  (R. at 26.)  Accordingly, the ALJ determined that

Plaintiff was not disabled at any time between her amended alleged onset date of April 25, 2007, and the date of the ALJ's decision.  (R. at 27.)

## II.  ANALYSIS

### A.  <u>Legal Standards</u>

#### 1.  **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id.*  Therefore,

the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id.*

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R.

§ 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)).   Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**     **Issues for Review**

Plaintiff presents the following issues for review:

(1)     The Commissioner's administrative findings, including the credibility determination, must be supported by substantial evidence. The ALJ misstates the evidence of record when making the credibility finding and fails to include well-supported limitations in his RFC finding.  Are the ALJ's credibility and subsequent residual functional capacity findings supported by substantial evidence, and if not, did those unsupported findings prejudice Plaintiff's case?

(2)     The ALJ must determine the credibility of medical experts as well as lay witnesses and weigh their opinions and testimony accordingly.  The ALJ failed to mention the presence of or testimony given by the Plaintiff's sister at the administrative hearing.  Is the ALJ's decision supported by substantial evidence?

(Pl. Br. at 1.)

**C.**     **Plaintiff's Credibility**

Plaintiff first argues that the ALJ failed to properly assess her credibility and that his reasons

- 18 -

for rejecting her subjective complaints are not supported by the record.  (Pl. Br. at 10, 12.)[6]

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  The ALJ is in the best position to assess a claimant's credibility because he "enjoys the benefit of perceiving first-hand the claimant at the hearing."  *Falco v. Shalala*, 27 F.3d 160, 164 n.18 (5th Cir. 1994).  In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process.  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).  First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id.*  Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id.*  If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements.  *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effects.  SSR 96-7p, 1996 WL 374186, at *2.  Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider.  *See* 20 C.F.R. § 404.1529(c) (2011).[7]  Nevertheless, the Fifth Circuit has held that the ALJ is not required to follow

---

[6] Although briefed as part of the RFC issue, this argument is addressed separately because it involves a different legal analysis.

[7] These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms

- 19 -

"formalistic rules" in assessing credibility, and he must articulate his reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco*, 27 F.3d at 163.

Ultimately, the mere existence of pain is not an automatic ground for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citations omitted). Likewise, an individual's statements regarding pain and other symptoms alone are not conclusive evidence of a disability and must be supported by objective medical evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(a).

Here, the ALJ listed the credibility factors provided by the regulations, and "after careful consideration of the entire record," he determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with his RFC assessment. (R. at 24.) He determined that while Plaintiff undoubtedly "experience[d] some pain," her allegations about her impairments and their impact on her ability to work were "only partially credible" in light of her statements about her daily activities, lifestyle, and ability to work, the type of treatment that she received, the opinions of treating and examining physicians, and the opinions of the state agency medical consultants. (R. at 23-24.)

### 1.     *Plaintiff's Mental Limitations*

Plaintiff argues that the reasons given by the ALJ for rejecting her allegations concerning her mental impairments are not supported by the record. (Pl. Br. at 12.)

---

(e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3.

The ALJ first noted that Plaintiff treated her bipolar disorder with medication, and that her medication helped with her depression.  (R. at 23, 24.)  He noted that despite Plaintiff's allegations that due to her mental disorders she had mood swings, became easily frustrated and upset, avoided being around others, and had trouble focusing, she worked as a telemarketer until she was laid off in 2007.  (R. at 23.)  He noted that while Plaintiff alleged to have a lack of energy and motivation due to her depression, she also stated that she was independent with her activities of daily living.  She read, shopped, watched TV, attended church, and was able to drive.  (R. at 24, 25, 292.)  He noted Dr. Gleaves's GAF assessment of 60, which he explained "indicat[ed] some moderate symptoms or difficulty in social and occupational functioning."  (R. at 24.)  He noted that Plaintiff was treated for her bipolar disorder at ABC Behavioral Health from April 2004 to March 2008.  (*Id.*)

The ALJ gave less weight to Ms. Adams's evaluation, finding that it was an "other" source rather than an "acceptable source" of medical evidence as defined by the regulations.  (R. at 25.)  He rejected her opinions about Plaintiff's work-related limitations, finding them "unconvincing" and unsupported by the objective medical evidence.  (*Id.*)  He accepted her assessment that Plaintiff had "*some* loss of ability" to perform certain work-related activities but was still capable of consistently performing them independently, appropriately, and effectively.  (R. at 25, 661) (emphasis in ALJ's decision).  Overall, he rejected her conclusions about Plaintiff's ability to work, explaining that they appeared to be based primarily on Plaintiff's subjective complaints.  (R. at 25.)

The ALJ properly considered the evidence regarding Plaintiff's mental impairments, including her hearing testimony and her physicians' opinions, and provided a reasoned analysis in support of his credibility assessment as to her mental limitations.

2. *Plaintiff's Physical Limitations*

Plaintiff argues that the ALJ improperly rejected pertinent medical evidence when assessing the credibility of her statements concerning her physical limitations.  (Pl. Br. at 10-12.)

The ALJ noted inconsistencies in Plaintiff's statements regarding her physical limitations and found that they conflicted with the medical evidence in the record.  (*See* R. at 23-25.)  For instance, Plaintiff testified that she last used drugs in 2000 or 2001 but tested positive for cocaine in 2006. (R. at 25, 56.)  While she testified that the pain and numbness in her left arm and the pain in her neck prevented her from working, she told Dr. Gleaves that she was independent with her basic activities of daily living. (R. at 23, 24, 43, 292.)  She also told physicians that she could drive, read, shop, watch TV, spend hours working in her garden, and even "pop her neck" like the chiropractor.  (R. 23-25, 292-93, 309, 622.)

The ALJ adopted treating physicians' diagnoses that Plaintiff had multilevel degenerative disc disease with mild to moderate canal stenosis and cervical and lumbar spondylosis.  (R. at 23, 263, 434.)  He noted the absence of medical evidence indicating "any significantly decreased range of motion of [Plaintiff's] spine," or "any significant muscle weakness or atrophy." (R. at 24.)  He found that there was "no evidence of any spinal-related motor, reflex, sensory, or neurological deficits." (*Id.*)  In February 2008, Plaintiff's extremities had no swelling, tenderness, or muscle atrophy and that the sensation in her arms was "grossly intact." (R. at 421.) That same month, Dr. Hu opined that there was no evidence of radiculopathy in her upper extremities. (R. at 424.)  In May 2008, Plaintiff's orthopedic surgeon found that the sensation in her right upper extremities was grossly intact and that she had a "full range of motion" in her cervical spine.  (R. at 650.)

Based on the evidence, the ALJ concluded that Plaintiff last stopped working because she

was laid off rather than because she was suffering from any disabling impairment.  (R. at 24.)  He found her receipt of unemployment benefits after her alleged onset date to be an indication of her continuing ability and willingness to work.  (R. at 24-25.)

The ALJ's decision stated that Plaintiff had received "only conservative" as opposed to more aggressive treatment for her conditions such as injections, physical therapy, or pain management.  (R. at 24.)  He noted that Plaintiff had "declined" to undergo a steroid shot in February of 2007.  (R. at 23, 533.)  Elsewhere, however, he noted her testimony that steroid injections temporarily relieved her neck pain.  (R. at 23, 57.)  He also noted her physicians' remarks that she was  receiving physical therapy for her chronic head, neck , and shoulder pain.  (R. at 23, 522.)  He did not take notice of her orthopedic surgeon's referral to pain management.  (*See* R. at 646.)

Here, the ALJ was not required to articulate his reasons for rejecting Plaintiff's subjective allegations because the evidence as a whole did not "clearly favor" her.  Although not in a formalistic fashion, the ALJ did consider the factors for assessing credibility and relied on substantial evidence, including objective medical evidence as well as Plaintiff's own statements, to support his credibility determination.  Even if the ALJ erred by stating that Plaintiff had received only conservative treatment, he later acknowledged her aggressive treatment methods, and remand is not required because his credibility determination was substantiated by other evidence of record.  *See Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *10 (N.D. Tex. 2011) (applying harmless error analysis to an ALJ's credibility determination); *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (same); *see also Prince v. Barnhart*, 418 F. Supp. 28 863, 872 (E.D. Tex. 2005) (holding that because "[w]eighing conflicting evidence is the prerogative of the fact-finder," harmless error analysis applies to an ALJ's credibility determination, even if his decision is "self-

contradictory").

Because substantial evidence supports the ALJ's credibility assessment of Plaintiff, remand is not required on this issue.

## D.    The Sister's Credibility

Plaintiff also argues that Ms. Rosado's testimony supported Plaintiff's testimony and that the ALJ erred by failing to address it in his disability decision.  (Pl. Br. at 15.)  She also argues that the ALJ was required to make a credibility determination of Ms. Rosado's testimony.  (Pl. Br. at 13) (citing to *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

When no objective evidence supports a lay person's testimony, the ALJ has discretion to reject it "because the observations of an individual, particularly a lay person, may be colored by sympathy for the affected relative or friend and influenced by that person's exaggeration of his limitation."  *Green v. Astrue*, 10-CV-01075, 2011 WL 3502478, at *15 (S.D. Tex. Aug. 10, 2011) (citing *Harrell v. Bowen*, 862 F.2d 471, 482 (5th Cir. 1988)) (per curiam); *see also Detraz v. Comm'r of Soc. Sec.*, No. 2:07CV177-DAS, 2009 WL 1324960, at *6 (N.D. Miss. May 12, 2009) (same).  The ALJ commits reversible error, however, when he rejects a lay witness's testimony for which there was "a reasonable basis" other than the claimant's subjective complaints.  *See Green*, 2011 WL 3502478, at *15;  *Detraz*, 2009 WL 1324960, at *6 .

Here, Ms. Rosado testified that Plaintiff was "really, really, really forgetful" and would forget things that were said to her 10 minutes earlier.  (R. at 59.)  She stated that Plaintiff got "cranky" very easily and could not be around many people at once because she became frustrated. (R. at 60.)  This testimony corroborated Plaintiff's testimony that she had difficulty focusing because other things came into her mind when she thought of things to do and that she could not be around

a lot of people at a time because she became frustrated or confused.  (*See* R. at 45.)

The medical evidence shows that treating and consulting physicians found that Plaintiff's concentration and short and long term memory were good or intact, and therefore it contradicts Ms. Rosado's testimony regarding Plaintiff's forgetfulness.  (*See, e.g.*, R. 294, 311, 333, 359, 606.) Treatment notes from ABC Behavioral show that Plaintiff complained to clinicians that she was irritable and became easily upset.  (*See, e.g.*, 346, 356, 373, 375.)  Ms. Rosado's testimony corroborated Plaintiff's subjective statements to clinicians about her irritability and quick temper. Because Ms. Rosado's testimony was not supported by objective medical findings, the ALJ was not required to address it.  *See Gardner v. Massanari*, 264 F.3d 1140, 2001 WL 822457, at *1 (5th Cir. 2001) (per curiam) (not selected for publication) (holding that the ALJ's failure to "comment directly" on the testimony of the claimant's mother was not grounds for reversal because it was "essentially duplicative" of the claimant's own testimony).  Accordingly, because the ALJ did not err in failing to address the testimony of Plaintiff's sister, remand is not required on this issue.

## E.   RFC Determination

Plaintiff also argues that the ALJ failed to include all of her limitations supported by the evidence in the record.  (Pl. Br. at 10.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R.

§ 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1.

The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco*, 27 F.3d at 164. A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Accordingly, a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged limitations and evaluating the medical evidence of record, the ALJ concluded that Plaintiff had the RFC to perform light work with the following limitations: lift and carry 20 pounds occasionally and 10 pounds

frequently; sit, walk, and stand for about 6 hours of an 8-hour workday; occasionally climb ladders and stairs, balance, stoop, kneel, and crouch; and "limited to simple routine tasks with no more than occasional contact with the general public."  (R. at 22, 24.)

### 1.    Plaintiff's Mental Limitations

Plaintiff argues that her GAF scores of 40 and 50 indicated that she had greater mental limitations than those recognized by the ALJ.  (Pl. Br. at 12.)

In determining Plaintiff's mental limitations, the ALJ noted her testimony that she suffered from bipolar disorder, mood swings, and depression.  (R. at 23-24.)  He noted that Plaintiff treated those conditions with therapy and medication.  (*Id.*)  He adopted Dr. Gleaves's assessment of Plaintiff's GAF of 60, which he explained "indicat[ed] some moderate symptoms or difficulty in social and occupational functioning."  (R. at 24.)  He noted Plaintiff's statements to Dr. Gleaves and other physicians that she was independent with her activities of daily living, in that she read, shopped, watched TV, and attended church. (R. at 23.)  He also noted that Plaintiff was able to drive and that she worked as a telemarketer until she was laid off shortly before her consultation with Dr. Gleaves.  (R. at 23-24.)

The ALJ noted that Plaintiff was treated for her bipolar disorder at ABC Behavioral Health from April 2004 to March 2008.  (R. at 24.)  On numerous visits she reported to clinicians that she was feeling "just fine," "very well," "better," and "stable" and that her medicines were helping. (*See, e.g.*, R. at 333-35, 352, 354, 365, 381, 379.)  In July 2008 she stated that she really wanted a job and was applying for at least two jobs per week.  (R. at 609.)  It was noted that she was doing very well and showed no reason for more intensive case management.  (R. at 608.)

The ALJ gave less weight to Ms. Adams's evaluation, finding that it was an "other" source

rather than an "acceptable source" of medical evidence.  (R. at 25.)  He accepted her opinion that Plaintiff had "*some* loss of ability" to perform certain work-related activities but could still consistently perform them independently, appropriately, and effectively.  (R. at 25, 661) (emphasis in ALJ's decision).  He noted Ms. Adams' opinion that Plaintiff's ability to function minimally on that day did not necessarily mean everyday.  (*Id.*)  Overall, he rejected Ms. Adams's conclusions, including her assessment of Plaintiff's GAF score of 40, finding them to be "unconvincing," unsupported by the objective medical evidence, and apparently based on Plaintiff's subjective complaints.  (*Id.*)

Because the disability determination falls within the purview of the ALJ, he was not required to accept Ms. Adams's conclusions.  *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). As the fact-finder, the ALJ had the sole responsibility for deciding whether Ms. Adams's opinions were supported by the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] ... to resolve.").  Accordingly, substantial evidence supports the ALJ's RFC determination as to Plaintiff's mental limitations.

### 2.    *Plaintiff's Physical Limitations*

Plaintiff argues that in assessing her physical limitations, the ALJ failed to account for evidence that she suffered from several spinal-related sensory and neurological defects, such as numbness, radicular pain, and reduced sensation.  (Pl. Br. at 10.)  She argues that she was prejudiced by the error because if the ALJ had considered this evidence, a "different RFC determination would have been found," which "could have led to a different disability determination."  (Pl. Br. at 13.)

In determining Plaintiff's physical RFC, the ALJ adopted treating physicians' diagnoses that

- 28 -

she had multilevel degenerative disc disease with mild to moderate canal stenosis and cervical and lumbar spondylosis.  (R. at 23, 263, 434.)  He noted the absence of medical evidence indicating Plaintiff had a "significantly decreased" range of motion in her spine or any significant muscle weakness or atrophy.  (R. at 24.).  He further found that there was no evidence of any spinal-related motor, reflex, sensory, or neurological deficits.  (*Id.*)  He noted that Plaintiff had not undergone surgery and that no treating or examining physician had found it to be necessary to treat her condition.  (*Id.*).  He also noted that no physician had restricted Plaintiff's activities of daily living, and that she had no need for an assistive device to help her ambulate. (*Id.*)

Lastly, the ALJ considered Dr. Post's physical RFC assessment from August 2007, but rejected her conclusion that Plaintiff could perform medium level work because subsequent medical evidence showed that she was "somewhat more functionally limited physically" than Dr. Post had determined.  (R. at 25.)

The evidence before the ALJ showed that Plaintiff was diagnosed with various neurological conditions relating to her cervical spine.  In December 2007, she was diagnosed with cervical spondylosis and spinal stenosis and was informed that the symptoms included numbness, problems with maintaining balance, and weakness.  (R. at 434.)  In February 2008, her numbness and pain in her left shoulder and arm were "consistent with left C7 radiculitis."  (R. at 424.)  In May 2008, Dr. Bolesta diagnosed disk bulging and degenerative changes in her cervical spine, opining that her sensation had decreased in " her left C5, C6, and C7 dermatomes" and that she was showing progressing changes in her neck and upper left extremity pain.  (R. at 644-47, 650.)  By August 2008, she was diagnosed with "cervical, herniated nucleus pulposus with radiculopathy *on the left*" and the lateral rotation of her cervical spine had decreased. (R. at 623, 636.) (emphasis added).  In

March 2009, the sensation in the radial and median nerve distribution of her left hand had grossly decreased, and she was diagnosed with left hand pain and cervical radiculopathy.  (R. at 732.)  In March 2010, it was opined that her chronic neck pain was caused by cervical radiculopathy.  (R. at 693.)

These diagnoses did not conflict with the evidence relied on by the ALJ in assessing Plaintiff's physical RFC because they related to different physical conditions.  For instance, while the ALJ found that there was no evidence showing that Plaintiff had a significantly decreased range of motion in her spine, muscle weakness, or atrophy, the evidence revealed that she had radiculopathy, a condition affecting the nerves in her cervical spine.  (*See* R. at 24, 424, 623, 636, 693.)  In his decision, the ALJ did not account for Dr. Bolesta's opinion that Plaintiff showed progressing changes in her neck and left arm, or for the fact that the symptoms of cervical spondylosis, which include pain, stiffness, headache, loss of balance, and loss of sensation in the shoulders and arms, gradually increase over time.  *See Attorneys' Dictionary of Medicine and Word Finder,*at C-176.  Accordingly, this evidence fairly detracts from the ALJ's determination as to Plaintiff's exertional limitations.

Nevertheless, because an RFC determination can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that he rejected, Plaintiff must show that she was prejudiced by the ALJ's finding that there was no evidence that indicated she suffered from spinal-related sensory or neurological deficits.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam) (holding that because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected"); *see also Falco*, 27 F.3d at 164.

- 30 -

"Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  To establish prejudice warranting remand, Plaintiff must show that consideration of the evidence relating to the neurological condition of her cervical spine might have led to a different decision of disability.  *See Newton*, 209 F.3d at458; *McNair*, 537 F. Supp. 2d at 837.

Here, if the ALJ had considered such evidence, his RFC determination might have included stricter limitations on Plaintiff's ability to lift and carry, push, or pull weight with her left arm.  He might have also included manipulative limitations as to her left hand.  Had the ALJ included such limitations in his hypothetical to the VE, a different determination might have been reached as to Plaintiff's ability to perform the jobs of garment steamer, sheet metal pattern maker, or collator operator.  Accordingly, remand is required because the evidence rejected by the ALJ casts doubt on the existence of substantial evidence supporting his RFC determination, and its consideration might have led to a different decision of disability.

### III.     CONCLUSION

Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this 30th day of September, 2012.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 31 -